## SEATTLE HARDWARE CO. v. SQUIRE.

### No. 1059.

United States District Court
W. D. Washington, S. D.
Dec. 30, 1948.

Jones & Bronson, of Seattle, Wash., for plaintiff.

J. Charles Dennis, U. S. Atty., of Tacoma, Wash., Thomas R. Winter, Sp. Asst. to Chief Counsel, of Seattle, Wash., and Homer R. Miller, Sp. Asst. to Atty. Gen., Bureau of Internal Revenue, for defendant.

LEAVY, District Judge.

This is an action brought under section 1340 of 28 U.S.C.A., as qualified by section 3772 of the Internal Revenue Code, as amended, 26 U.S.C.A. § 3772, for the recovery of income and excess profits taxes, alleged to have been erroneously and illegally assessed and collected for the fiscal years 1941 to 1945, inclusive, excepting the year 1942.

The question presented here is whether the corporate entity of the Occident Trust Company should be recognized in connection with the record ownership of certain real property prior to the time such property was formally transferred by it to plaintiff herein, the Seattle Hardware Company, on February 21, 1906. The question is succinctly stated by plaintiff in its brief, to wit: Was the property owned by Occident Trust Company or the Seattle Hardware Company?

I shall refer to the Seattle Hardware Company as "taxpayer" and to the Occident Trust Company as "Occident."

The taxpayer was organized as a corporation and began doing business, engaged in the wholesale hardware business in Seattle, in March, 1885. It prospered and expanded with the rapid growth of the city during the years following its establishment. A summary of the facts as I find them is that, in 1901, long before the days of federal income taxes, as well as before the days when workmen's compensation laws were in existence in this state, taxpayer desired to acquire two lots adjoining the one it then owned, upon which it intended to erect a building sufficiently large to meet its then needs and for future years.

A deed of conveyance, dated April 19, 1901, from Stetson & Post Mill Company to Ira Bronson evidenced the purchase of the property by taxpayer, the consideration therefor being $60,000, which was paid by taxpayer. The purchase was made by Bronson as taxpayer's agent, and for the reason the taxpayer believed a better bargain could be obtained by dealing in this manner. Ira Bronson at all times held title to this property in trust for the true owner, the taxpayer.

On April 15, 1901, at the direction of taxpayer, Mr. Bronson, together with two other persons not identified with taxpayer in any manner, organized the Occident Trust Company as a corporation, and Bronson subscribed for the entire capital stock of this corporation, as is evidenced by its articles of incorporation. These articles of incorporation were filed with the secretary of state two days later, April 17, 1901. On the same day that the articles of incorporation were executed by Mr. Bronson and his coincorporators, they all resigned. No stock certificate was ever issued to Bronson by the corporation for all

or any part of its capital stock, and neither money nor property passed from Mr. Bronson, nor any other person or corporation, to Occident for any of its capital stock. Occident never issued stock to any one, as it kept no stock book. However, on the day of the execution of its articles of incorporation, following the resignation of its incorporators, M. D. Ballard, F. W. Baker, and C. H. Black, trustees and stockholders of taxpayer, were elected to fill the vacancies of those resigned; and on April 18th, at a meeting of the stockholders of Occident, M. D. Ballard was elected president, F. W. Baker, treasurer, and C. H. Black, secretary, though they were not legally chosen for these positions, since there was no one representing Occident, either as incorporator or as stockholder, to choose them.

On September 1, 1903, taxpayer set up a committee to perfect plans for the erection of a building on the lots in question, legal title to which was then in the name of Bronson, its attorney. It employed architects and took all the essential steps for the construction of the building, and carried through all negotiations in the way of financial obligations. It paid all the costs for the construction of the building, though it had them charged on its accounts to Occident. It also, during this time, and in the whole period of time from the original acquisition of the property until the completion and acceptance of the building, paid all the taxes and assessments against the property; and it collected the receipts produced from certain minor rentals before the old buildings that stood upon the property were removed to make way for the new corporation.

On October 1, 1903, a warranty deed, executed by Bronson and wife to Occident, for a recited consideration of $100,000, was placed of record. There was no actual consideration whatever passing from Occident to Bronson, either in money or in stock. Construction of taxpayer's building, in accordance with its plans and specifications, under orders and directions of its building committee, was undertaken by taxpayer.

September 21, 1905, it having been found that additional funds would be required to complete the building, taxpayer negotiated for a loan of $150,000 for the purpose of securing such funds. A note and mortgage were given, the mortgage being signed by Occident and the note by Occident and taxpayer, as well as by certain members of taxpayer's board of directors as individuals. The money produced by this mortgage went into the treasury of taxpayer, and all principal and interest on account thereof was paid by taxpayer.

On February 21, 1906, which was a few months after the completion of the building, a deed was executed by Occident through its officers, who purported to act as such, conveying the property from Occident to taxpayer, subject to the existing mortgage of $150,000. This conveyance was held by taxpayer until January 20, 1908, when it was filed for record. Thereafter, Occident entirely passed out of the picture, and taxpayer, which had previously paid the annual license fee of Occident, no longer made such payments, so that, in due time thereafter, under the laws of the State of Washington, Occident as a corporation was stricken from the rolls. There never was a liquidation of Occident, since it had no assets from the time it was incorporated until being stricken by the secretary of state for failure to pay its annual license fee.

The purchase price of the lots in question in this last transaction, as evidenced by the conveyance from Occident to taxpayer, was set up in the books of taxpayer as being $225,000. This was the appreciated value of the property from the time it was first acquired by taxpayer in 1901 to the time of the formal conveyance by Occident to it.

In 1945, taxpayer sold the property at a figure that would result in a substantial loss if its initial cost were to be considered as $225,000, the sum of money represented to have been paid to Occident upon conveyance of the property to taxpayer. If the base figure for cost be taken as the amount of money taxpayer paid through its attorney, Bronson, in 1901, for the acquisition of the property, $60,000, then the sale of the property in 1945 would show a profit and support the taxes assessed and collected against the property.

It is clearly established in this case that taxpayer paid in actual money no more than the original $60,000 furnished to Bronson, its attorney, when the property was purchased on its behalf. The property, while in Bronson's name, was held by him as the agent and representative of taxpayer and for taxpayer's use and benefit, subject to its orders and directions, and the same condition prevailed during all the time title stood in the name of Occident. The sole purpose and object of acquiring the property by taxpayer was to construct a building suitable for the business being carried on by it to meet its immediate and prospective needs. The passing of title from Bronson to Occident, and the holding of such title by Occident, was to relieve taxpayer from any liability that might arise during the course of construction of the building. The paper transactions relating to the ownership of the property did not remove it from the assets of taxpayer from the date of its acquisition in 1901.

Mr. Roy P. Ballard, who for many years was treasurer of taxpayer, is the only person now living familiar with the facts during the years here in question. He was in intimate touch with everything that took place during that time. He, due to physical illness, testified by deposition. His testimony, in a large measure, supports the facts as I have heretofore stated them.

The facts, other than those testified to by Mr. Ballard, are found in the documentary evidence introduced herein, particularly plaintiff's exhibit No. 5, being the only record of Occident, and which, I find, was the only record it ever had; plaintiff's exhibit No. 8, being the private ledger and monthly statement of taxpayer; and plaintiff's exhibit No. 2, the minute book of taxpayer.

From the facts as I have found them, we have presented the issue of law as to whether Occident ever, in fact, was more than a nominal holder of the property. I am forced to the conclusion that it was not a corporate structure acting in any sense as an independent entity; and that it never was more than an instrumentality created by taxpayer temporarily to hold title for taxpayer, and nothing more, during its short and incomplete existence as a corporate structure. Its officers were only nominally such, since there was no one to choose them initially after the resignation of the original incorporators. At no time during its existence did it have outstanding any of its capital stock, because none had ever been issued.

The consideration of $225,000, recited as going from taxpayer to Occident, is a fictitious one, and the property here in question, at all times following the date of its acquisition by Mr. Bronson in April, 1901, was, and continued to be, the property of taxpayer. Its cost to taxpayer was the original $60,000 paid therefor through Mr. Bronson; and this sum is the actual investment made by taxpayer and upon which it was entitled to calculate its liability for taxes during the years here involved, and as indicated by its income excess profits tax returns for those years.

It is clear that the only investment in money that taxpayer ever made in this property was the $60,000 it furnished to its attorney, Bronson, for the acquisition of the property in 1901, and all that took place until formal conveyance by Occident to taxpayer of the property, following the period of construction by taxpayer of the building, were the acts of taxpayer, and not of Occident. This in no way added to the original cost of the property to taxpayer. In other words, looking through form and applying substance, as established by the facts, taxpayer had an actual investment of $60,000 in the property; and, therefore, the figures used in making its tax returns during the years here involved must be accepted as correct.

Exceptionally able briefs have been submitted by both sides in this controversy. I can see no good purpose that would follow an analysis of the many cases cited. There is no serious dispute as to the law. The only issue of law is whether the facts bring this case within the well-known rule of "separate entity."

There are two cases that taxpayer relies upon very heavily. One is Haskell v. Mc-Clintic-Marshall Co., 1923, 289 F. 405, from this circuit, and the other is Moline Properties v. Commissioner of Internal

Revenue, 1943, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499. A reading of these two cases readily distinguishes the facts in them from those here found. In the Haskell case, the distinction is at once noticeable because there the corporate structure was in all respects a completely organized corporation. It carried on activities within the limits of its articles of incorporation. It issued stock. It kept books and records. It assumed responsibilities, many of which were entirely independent of its parent, the banking corporation, and it had a purpose for its existence beyond that of being the mere alter ego, or agent, or conduit of its parent corporation. What is true of the Haskell case is also the situation in reference to the Moline case.

The plaintiff also cites, and relies upon, the following cases, among others, all of which the court has examined and finds them readily distinguishable on the facts: Commissioner of Internal Revenue v. Laughton, 9 Cir., 113 F.2d 103; Rogan v. Starr Piano Co., 9 Cir., 139 F.2d 671; New Colonial Ice Co., Inc., v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406.

The defendant cites, among many others, the following cases as establishing the exception to the general rule of an independent entity: Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Minnesota Tea Co. v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135; United States v. Brager Bldg. & Land Corp., 4 Cir., 124 F.2d 349.

The cases cited by defendant all support the conclusion here reached, that Occident was not an independent legal entity, but merely a fully controlled agency or instrumentality through which taxpayer operated.

Having determined the basis from which values must be calculated to be that upon which taxes have been paid, the plaintiff's action will be dismissed. Appropriate findings of fact and conclusions of law and decree may be submitted upon notice.