UNITED STATES of America,
Appellant,

v.

GENERAL GEOPHYSICAL COMPANY,
Appellee.

No. 18530.

United States Court of Appeals
Fifth Circuit.

Oct. 20, 1961.

Rehearing Denied Dec. 7, 1961.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., William B. Butler, U. S. Atty., Houston, Tex., Gilbert E. Andrews, Jr., Harry Baum, Attorneys, Department of Justice, Washington, D. C., R. F. Wheless, Jr., Asst. U. S. Atty., Houston, Tex., for appellant.

Homer L. Bruce, Houston, Tex., Baker, Botts, Andrews & Shepherd, Houston, Tex., of counsel, for appellee.

Before RIVES and WISDOM, Circuit Judges, and DAWKINS, Jr., District Judge.

WISDOM, Circuit Judge.

February 25, 1954 General Geophysical Company, the taxpayer, transferred certain depreciable assets having a tax basis of $169,290 and a market value of $746,525 to two of its major stockholders in the redemption of their stock. Later that day the taxpayer reacquired the same assets from the former stockholders in exchange for corporate notes in the amount of $746,525. In its 1954 income tax return the corporation claimed depreciation deductions using as the cost basis the market value of the assets at the time of the transaction.[1] The sole question this litigation presents is whether the corporation's reacquisition of the assets stepped up the basis. We hold that it did not and reverse the decision below.

Earl W. Johnson founded General Geophysical Company in 1933 to engage in oil exploration, and managed its operations until his sudden death in 1953. At his death his estate, his wife, his mother, and a friend Paul L. Davis owned 77%

1. In addition to the dispute over depreciation deductions this appeal also affects the taxation of the sale of a small portion of the assets, which produced a taxable gain of $191 according to the taxpayer, $11,049 according to the Government.

of the corporation's total stock and 94% of its voting shares. The major portion of the remaining shares was owned by Chester Sappington, T. O. Hall, and Albert B. Gruff, who were also officers in the corporation. The Johnson stock was community property: half belonged to the widow and the other half was held by the Second National Bank of Houston as executor and trustee for Johnson's estate. The testimony shows that the bank and Mrs. Johnson soon realized that neither of them could contribute anything of value to running the corporate business, and that they should not attempt it. They realized also that if the corporation were liquidated and its properties sold, they would receive less than the value of their stock in a going concern. Sappington, Hall, and Grubb believed that they could run the corporation successfully and if so, they should receive its future profits. Accordingly, the corporation agreed to retire the stock held by the bank, the two Mrs. Johnsons, and Davis. After long negotiations the parties settled on a valuation of the stock at $245 a share, payable partly in cash and partly in notes. The attorney for the retiring stockholders advised against this proposal for fear that it would leave the stockholders without sufficient protection in case the corporation should be forced into bankruptcy. He based this legitimate business fear on Robinson v. Wangemann, 5 Cir., 1935, 75 F.2d 756, 758, which holds that when a former shareholder owns notes of a bankrupt corporation, received in the redemption of his stock, he "cannot be permitted to share with the other unsecured creditors in the distribution of the assets of the bankrupt estate." To avoid exposure to this risk, the stockholders proposed that the Johnson stock be retired in exchange for cash and corporate property having a market value equal to that of the stock. The redemption was carried out in accordance with this proposal. A few hours later, the corporation repurchased the property for corporate notes, giving the former stockholders a mortgage on certain of its properties.

Witnesses for the taxpayer insisted that there was no agreement between the corporation and the stockholders to re-exchange the corporate properties transferred to the stockholders in the redemption of their shares. The trial judge so found, and it seems clear that there was no legally binding agreement to that effect. The attorney for the stockholders did testify, however, that he had discussed the possibility of such a resale and before February 25, 1954 had prepared the documents for a resale in case that was decided upon after the initial transfer.

Under Section 1012 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1012, "the basis of property shall be the cost of such property." This requires a determination of when the taxpayer acquired the property and the price he paid for it. Our decision depends on whether or not the transactions in question created an interruption in the ownership of the property, producing a new basis on its reacquisition. The Government asserts that we should disregard the form of the transfer and recognize that the substance of the transactions was a redemption of the corporate stock for cash and notes, leaving the ownership and basis of the depreciable assets undisturbed. The taxpayer answers that there was no fraud or subterfuge in these transactions, that the stockholders acquired complete and unfettered ownership of the properties, and that the trial judge's finding of two separate and independent transactions cannot be overturned on appeal.

The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. This generalization does, however, reflect the truth that courts will, on occasion, look beyond the superficial formalities of a transaction to determine the proper tax treatment.

In the landmark case of Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, the Supreme Court refused to give effect to corporate transactions which complied precisely with the formal requirements for nontaxable corporate reorganizations, on the ground that the transactions had served no function other than that of a contrivance to bail out corporate earnings to the sole shareholder at capital gains tax rates. In Commissioner v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, the Supreme Court taxed a corporation on the gain from the sale of an apartment house notwithstanding a transfer of the house to the corporation's two shareholders before the sale, since it found that the transfer was made solely to set in a more favorable tax form a sale which in reality was made by the corporation. Similarly, in Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, the Supreme Court taxed a trust grantor on the income of the trust property since the formal transfer of the property by the grantor was lacking in substance. The Court found that the dilution in his control seemed insignificant and immaterial and that "since the husband retains control over the investment, he has rather complete assurance that the trust will not effect any substantial change in his economic position." 309 U.S. at pages 335–336, 60 S.Ct. at page 557. See also Estate of Weinert, etc. v. Commissioner of Internal Revenue, 5 Cir., 1961, 294 F.2d 750; Liston Zander Credit Co. v. U. S., 5 Cir., 1960, 276 F.2d 417; Campbell v. Fasken, 5 Cir., 1959, 267 F.2d 792; Rupe Investment Corp. v. Commissioner of Internal Revenue, 5 Cir., 1959, 266 F.2d 624; Georgia-Pacific Corp. v. U. S., 5 Cir., 1959, 264 F.2d 161. Each case must be decided on its own merits by examining the form and substance of the transactions and the purpose of the relevant tax provisions to determine whether recognition of the form of the trans-action would defeat the statutory purpose.

The case at bar presents an unusual tax question created by the conjunction of two parts of the tax code not frequently brought together by a single transaction: the provisions governing basis and capital gains, and the rule that no gain is recognized by a corporation when it distributes property with respect to its stock. The basis of property is determined by its cost; when the property is sold the owner realizes a taxable gain equal to the difference between the basis and the proceeds received in the sale. There is no danger that a taxpayer could effect an artificial sale and repurchase to raise the basis of appreciated property, since such a transaction would subject him to a tax on the step-up in the basis. There are, therefore, no provisions to prevent tax avoidance by such a device, and the question whether a transfer and reacquisition should be recognized as independent transactions creating tax consequences would generally affect only the *timing* of the imposition of a tax rather than its *amount*. The twist here comes from the fact that the corporation did not incur a tax on the difference between basis and current market value when it transferred the assets to its shareholders in redemption of their stock. Section 311(a) of the Code, 26 U.S.C.A. § 311(a), provides that "no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of * * * property." This provision is expressly made applicable to stock redemption distributions by the Treasury Regulations.[2] The rule may be easily justified by the fact that when a corporation transfers appreciated property to its shareholders, as a dividend or in exchange for their shares, the gain created by the appreciation has not accrued to the corporation and should not be taxed to it.[3]

2. Treas.Reg. 1.311–1(a) (1955).

3. If the corporation in effect does realize the gain by handling the sale of the property after its distribution to the share-holders, the gain probably would be attributed to the corporation. See United States v. Lynch, 9 Cir., 1951, 192 F. 2d 718, certiorari denied 1952, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342; Com-

A new horizon of tax avoidance opportunities would be opened by allowing a stepped-up basis to result from the transaction here effected. Corporations would be enabled without difficulty to raise the basis of their assets whenever it fell below the market value by transferring the assets to shareholders by a dividend or stock redemption and then buying back the same assets for the cash that they otherwise would have distributed directly. Since market values are often pushed up by inflation and the basis is frequently reduced under the liberal depreciation rules far faster than the assets actually depreciate, this possibility would have enormous practical significance. These tax avoidance implications do not constitute a license to courts to distort the laws or to write in new provisions; they do mean that we should guard against giving force to a purported transfer which gives off an unmistakably hollow sound when it is tapped. It is a hollow sound for tax purposes; here, we are not concerned with business purposes or the legal effectiveness of the transaction under the law of Texas. Under the tax law, it is of course open to a corporation making a dividend distribution or a stock redemption to distribute appreciated assets rather than cash and to use its cash to purchase similar assets for replacement at a stepped-up basis. Such transactions are however limited by their costs. Moreover, in such a case it would be clear that the corporation had disposed of its former assets and acquired new ones. When, however, a corporation contends that it stepped up the basis by transferring assets to its shareholders and then reacquiring them, we must scrutinize the transactions to make sure that the alleged divestiture did occur. The transactions should be recognized as creating an interruption in the ownership of the assets sufficient to produce a new basis *only* when the corporation has made a clear and distinct severance of its ownership prior to the reacquisition.

The facts of these transactions will not support a holding that the corporation had terminated its ownership for these purposes. It parted with bare legal title to the property for a few short hours. It made no physical delivery of any of the assets. Its control and use of the property were never interrupted. Even the surrender of its legal title was made under circumstances creating a strong expectation that it would be returned shortly. True, the *stockholders* may have had complete legal freedom to refuse to resell the assets to the corporation, but there was almost no likelihood that they would do so. It was a foregone conclusion that they would resell the assets to someone, since the very reason for the original redemption was that the stockholders did not wish to continue ownership of the assets and management of the business. And since the assets were already integrated into the operations of the taxpayer and represented 47% of its assets,[4] the taxpayer was the logical, and as a practical matter, the only possible purchaser. That the stockholders had already drawn up papers for the resale, in case they decided

missioner v. Transport Trading & Terminal Corp., 2 Cir., 1949, 176 F.2d 570, certiorari denied 1950, 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589. These cases were decided before enactment of Section 311, but since that section is largely a codification of the rule laid down by General Utilities & Operating Co. v. Helvering, 1935, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154 which did precede these cases their validity is probably not undercut by the statute. Mintz and Plumb, Dividends in Kind—The Thunderbolts and the New Look, 10 Tax L.Rev. 41, 45–48 (1954). See generally Raum, Dividends

in Kind: Their Tax Aspects, 63 Harv.L. Rev. 593 (1950).

The tax treatment of the corporation making a stock redemption is of course not to be confused with the taxation of the shareholders, a field bursting with difficult problems. See, e. g., Bittker, Federal Income Taxation of Corporations and Shareholders, 208–245 (1959).

4. The assets transferred were valued by the parties at $746,525. At the rate of $245 per share, that total would represent 3047 shares, or slightly over 47% of the 6461 shares then outstanding.

to make one, undoubtedly strengthened the confidence with which the taxpayer could look forward to the reacquisition of the properties. There was never the whisper of a suggestion that the company was to cut down on its operations, as would be inevitable if it permanently parted with 47% of its assets, including three rigs. The most that can be said is that the taxpayer gave to the bank and Mrs. Johnson the power to divest it of its ownership of certain properties; they held that power for a few hours and then returned it. The transactions, from the corporation's standpoint, were more like an option than a sale, and the option expired quickly without having been exercised.

The taxpayer asserts that the transactions were prompted by a valid business purpose and were effected without a motive of tax avoidance. We accept these assertions, which are supported by the trial judge's findings, as true. They lend support to the taxpayer's case, but they do not control the disposition of the case. Intent often is relevant in questions of taxation, particularly where the bona fides of a transaction is called into question, but in most cases tax treatment depends on what was done, not why it was done. And our decision in this case rests not on the motivation of the transactions in question but rather on our conclusion that the admitted facts of the two transfers preclude a finding of a sufficient hiatus in the corporate ownership of the assets to justify bestowal of a new basis on them after the reacquisition.[5]

To determine the basis of the assets we look backward to ascertain when the corporation acquired them. We note the transactions here in question, but we can scarcely say that the corporation's ownership dates from that occasion. These transactions, whatever their effect on other legal questions, did not create an interruption in the ownership suffi-

cient to produce a new basis. The basis must be found from the original purchase price and the adjustments made to it. The district court's findings may be correct; his conclusions are in error.

The judgment is

Reversed.

On Petition for Rehearing

PER CURIAM.

The petition for rehearing in this case expresses strongly the petitioner's conviction that this Court failed to recognize the bona fides of the transaction. In denying this petition we wish, again, to make clear that we did not base the decision on a lack of good faith in the parties to the transaction. It is true that we said, "we should guard against giving force to a purported transfer which gives off an unmistakably hollow sound when it is tapped". But this statement was set off (in the same sentence) against the other extreme: "These tax avoidance implications do not constitute a license to courts to distort the laws or to write in new provisions." Throughout the opinion we were careful to say that our decision was not based on any lack of good faith in the parties to the transaction, and that we did not pass on the legal effect of the transaction outside of the tax frame of reference. We do not question the integrity of the parties or suggest that there was any flim-flam. We do not doubt the business purposes of the transaction. The decision does not purport to question the effectiveness of the transaction in protecting the stockholders against the holding in Robinson v. Wangeman, 5 Cir., 1935, 75 F.2d 756. But we hold and reaffirm that *for tax purposes* there was not a sufficient severance of the corporation's ownership over the assets for the transaction to create the tax consequence that when the corporation reacquired the assets it took

5. If these transactions could not have been explained by valid nontax reasons, they obviously would have been only a subterfuge which could not have been effective to change the basis of the assets.

Thal v. Commissioner, 6 Cir., 1944, 142 F.2d 874; Seattle Hardware Co. v. Squire, D.C.W.D.Wash.1948, 83 F.Supp. 106, affirmed 9 Cir., 1950, 181 F.2d 188.

them with a stepped-up basis. The transaction is analogous to a Clifford trust, valid under state law but ineffective *for tax purposes* to remove the trust income from the settlor's taxable income. Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788. It is ORDERED that the petition for rehearing filed in the above styled and numbered cause be, and the same is hereby

Denied.