GEORGE A. LaMAIR RESIDUARY TRUST, IOWA-DES MOINES NATIONAL BANK and GEORGE A. LaMAIR II, CO-TRUSTEES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. LaMAIR-MULOCK-CONDON COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
La Mair v. Commissioner
Docket Nos. 8643-74, 8644-74.
United States Tax Court
T.C. Memo 1977-333; 1977 Tax Ct. Memo LEXIS 111; 36 T.C.M. (CCH) 1337; T.C.M. (RIA) 770333; September 26, 1977, Filed Walter R. Brown,W. Kendall Brown,David C. Bauer, for the petitioners. Ronald M. Frykberg, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies: Petitioner
Docket Number
Year
Deficiency
George A. LaMair
8643-74
1971
$25,174.00
Residuary Trust
LaMair-Mulock-
8644-74
1970
$14,819.24
Condon Company These cases were consolidated for trial, briefing and opinion. Other issues having been disposed of by agreement of the parties, the issues for decision are: (1) Whether certain payments made by LaMair-Mulock-Condon Company to the Estate of George A. LaMair [1] *113 are deductible rental payments under section 162(a)(3) [2] or non-deductible payments for the redemption of stock. (2) If the payments are rent, whether the George A. LaMair Estate and Residuary Trust are entitled to amortize their adjusted basis in the leased property. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Iowa-Des Moines National Bank and George A. LaMair, II [3] were the co-trustees of the George A. LaMair Residuary Trust. On the date they filed the petition in Docket No. 8643-74, the Iowa-Des Moines National Bank was a corporation organized under the national banking laws of the United States, with its principal office in Des Moines, Iowa, and George A. LaMair, II resided in Des Moines. At the date of the filing of the petition in Docket No. 8644-74, LaMair-Mulock-Condon Company ("L-M-C") was an Iowa corporation with its principal place of business in Des Moines, *114 Iowa. L-M-C was incorporated in 1965. Prior to 1965, its operations were conducted through various predecessor corporations dating back to 1865. At all relevant times L-M-C operated a general insurance agency with a customer market within a 100 mile radius of Des Moines, Iowa. It served as a broker for its clients.As such, it placed their insurance needs with one of the various insurance companies it represented, depending upon the premium rates and coverages offered by the insurers. As a general insurance agency, L-M-C handled personal and commercial insurance. Its personal line business included homeowners, auto, personal property, life and liability insurance for individuals. Its commercial line business included workmen's compensation, liability, and business interruption insurance, as well as insurance on buildings and their contents.
In 1969 L-M-C had approximately 1,00 customer accounts. Two-thirds of the accounts were personal line accounts and one-third were commercial line accounts. Despite this ratio, L-M-C was principally a commercial line agency. The income derived from its commercial line accounts represented 95 percent of the agency's total income during *115 all relevant years.
In conjunction with its sales operations, L-M-C maintained customer files and insurance policy records for each customer. Typically the personal line customer files were less extensive than the commercial line customer files. A commercial line customer file normally included correspondence, transcripts of policies, a log of loss information (i.e., a digest of accidents and/or losses over a given period), loss prevention recommendations and surveys, loss and accident reports, and financial information (i.e., a financial statement or Dunn & Bradstreet report). The information in the commercial files provided L-M-C with a foundation from which to analyze the exposure to loss of the particular customer's business and, in turn, provided a basis upon which L-M-C could recommend a program of insurance, non-insurance and self-insurance. In addition, the information was essential in negotiations with the insurance companies directed towards obtaining lower premium rates. L-M-C considered its commercial customer files and records its most valuable asset and continually updated the information contained in those files to preserve their usefulness. Information older *116 than five years was customarily removed from the files and discarded because it was no longer useful to L-M-C. The files were kept by L-M-C in fire-proof cabinets. On July 31, 1969, George A.LaMair ("decedent"), president and director of L-M-C, died. At the date of his death the common stock of L-M-C was held as follows: Shareholder
Number of Shares
George A. LaMair
50
George A. LaMair II
25
C. Ben Condon
25
Total outstanding shares
100
Decedent was survived by his wife, a daughter and a son, George A. LaMair II.His will provided for the creation of a marital trust and a residuary trust. Pursuant to the terms of the will, decedent's executors created the George A. LaMair Residuary Trust. Decedent's wife had the right to the income from the residuary trust for her life, and the remainder was to be divided equally between decedent's two children at his wife's death. At the date of decedent's death, the by-laws of L-M-C provided that the corporation had a right of first refusal to purchase a shareholder's stock at the current fair value whenever a shareholder desired to sell or dispose of his stock. If the corporation failed to exercise such rights, *117 the other shareholders had a right of first refusal (in proportion to their current holdings) to purchase such stock. Following decedent's death, his estate and L-M-C entered into negotiations for the sale of decedent's 50 percent stock interest in L-M-C. The negotiations continued for several months, with discussions directed toward the method of effectuating the proposed sale and minimizing taxes. During these negotiations, representatives of the decedent's estate were informed of the income which had been generated from L-M-C's commercial accounts during the five previous years. The discussions culminated in the formulation of an overall redemption plan and the drafting of two documents, a redemption agreement and a lease, to implement that plan. The redemption agreement provided in part: 3. The Estate hereby sells 50 shares of stock in the Corporation and the Corporation hereby redeems such stock for the sum of Twenty-Seven Thousand Two Hundred Eighty One dollars 17/100 ($27,281.17) to be paid on or before July 31, 1970, with interest on all unpaid principal at the rate of eight percent (8%) per annum from the date of this Agreement. As further consideration for such *118 stock, the Corporation hereby distributes to the Estate an undivided fifty percent (50%) interest in all customer files and insurance policy records now owned by the Corporation. The lease agreement provided in part: 1. For and in consideration of Lessee's agreement to pay the rental specified herein, Lessor hereby leases to Lessee all its right, title and interest in and to all customer files and insurance policy records now owned by Lessor. 2. This Lease shall be for a term of five (5) years, commencing on the date of this Agreement and ending five (5) years from such date, unless earlier terminated upon default of Lessee. 3. Lessee agrees to pay Lessor as monthly rental for the property leased hereunder, during the term hereof, eleven percent (11%) of the monthly net commissions earned on sales of property casualty and surety insurance policies, more particularly described as the sum of Lessee's income accounts numbers 303 and 304 less Lessee's sum in account number 352, such monthly rental to be paid within fifteen (15) days from the close of each calendar month. On December 31, 1969, the redemption agreement and lease were executed simultaneously by officers of *119 L-M-C on behalf of L-M-C and by the Iowa-Des Moines National Bank on behalf of the estate. Custody, possession and control of the customer files which were the subject of the redemption agreement and lease remained continuously in the hands of L-M-C after the agreements were executed. The Iowa-Des Moines National Bank as executor of decedent's estate never inspected the files during the term of the lease. After execution of the agreement and lease, L-M-C made the following payments to the Estate of George A. LaMair and to the George A. LaMair Residuary Trust: [4] YEAR
AMOUNT
1970
$31,393.50
1971
44,370.50
1972
44,995.82
1973
29,788.51
In June 1973 the payments under the lease agreement were suspended by mutual agreement of the residuary trust and L-M-C pending the outcome of the Internal Revenue Service *120 audit of L-M-C's and the residuary trust's income tax returns. The suspension was prompted because the parties' intentions in executing the agreements would have been nullified if the payments were not treated as rent for federal income tax purposes. On the Federal estate tax return filed on behalf of decedent's estate, the 50 shares of L-M-C stock owned by decedent were valued at $155,448.11. The valuation was arrived at by adding $27,281.17 (the cash payment paid in redemption of decedent's L-M-C stock) and $128,166.94 (the amount which would have been paid under the lease agreement had it been in effect during the prior five year period). On its Federal income tax return for 1970, L-M-C claimed a $31,393.50 deduction for rent paid for the use of 50 percent of the customer files during the year. On its Federal income tax return for 1971, the residuary trust claimed a deduction of $21,360 for amorization of its interest in the customer files. Respondent in his statutory notice determined that the payments wre not rent but were installment payments on the purchase of stock and, as a consequence, disallowed the claimed rental and amortization deductions. In addition, respondent *121 determined that the residuary trust had additional income of $19,224 from the Estate of George A. LaMair, by reason of the disallowance of a deduction of $19,224 claimed by the estate on its income tax return for the period July 1, 1970 to March 30, 1971 for amortization of its interest in the customer files. OPINION The first issue for decision is whether the purported rental payments made by LaMair-Mulock-Condon Company ("L-M-C") to the George A. LaMair Estate and to the George A. LaMair Residuary Trust in fact constituted rent or payments for the redemption of stock. If the payments were rent, as L-M-C claims, and met the requirements of section 162(a)(3), [5] then L-M-C is entitled to a deduction for the payments. However, if the payments constitute payments for the redemption of stock as respondent claims, then L-M-C is not entitled to a rental deduction for the payments. *122 On December 31, 1969, following the death of George A. LaMair, L-M-C redeemed his stock interest in L-M-C, nominally for $27,281.17 cash and a 50% interest in L-M-C's customer files. Simultaneously the estate "leased" its 50% interest in the customer files back to L-M-C for 5 years, their entire useful life. The payment required under the purported lease was approximately 11% of the net commissions generated by L-M-C's commercial accounts. In 1973 the payments were suspended pending resolution of this case. L-M-C asserts that the redemption was a valid transaction as was the leaseback, that the rent was reasonable and as a consequence it is entitled to deduct the purported rental payments. Respondent, on the other hand, contends that in substance L-M-C redeemed the stock of decedent for deferred cash payments.He argues that the distribution of the 50% interest in L-M-C's customer files and their leaseback were merely a guise to obtain a deduction for the redemption payments. We agree with respondent. The crucial fact of the transaction is the absence of any reality in the purported "lease" of customer files. In fact, the 50% interest in these files, together with $27,281.17 *123 in cash, was transferred to decedent's estate in exchange for decedent's stock, then "leased" back to L-M-C for a percentage rental. However, the agreed useful life of the files was precisely coterminous with the period of the "lease"--five years. After five years, the files were routinely scrapped. There was no economically significant reversion to decedent's estate. The "lease", therefore, immediately divested the new "owner" (decedent's estate) of all economically significant concomitants of ownership, except L-M-C's obligation to pay "rent". In substance, ownership of the files reverted to L-M-C simultaneously with the purported transfer. The "sale" and "lease", considered together, achieve nothing of economic significance other than the redemption of the stock and L-M-C's obligation to make the "lease" payments. There was in substance a sale and resale cancelling each other out, not a sale and lease. The files never moved physically. The files were indispensable to L-M-C and useless to decedent's estate. There was no business purpose shown for the "lease". On the facts of this case, there was no substance to decedent's estate's transitory ownership of half the files. *124 We find that the purported "sale" and "lease", in other words, were a sham, a step transaction to nowhere. See Frank Lyon Co. v. United States,536 F. 2d 746 (8th Cir. 1976), cert. granted     U.S.     (February 22, 1977); Miller v. Commissioner, 68 T.C.     (August 29, 1977). All that was really accomplished was a stock redemption. The "lease" payments were, in fact, additional payments for decedent's redeemed stock. The elaborate masquerade of the "lease" was a mere device used in hopes of rendering such redemption payments deductible to L-M-C and of generating basis for depreciation in decedent's estate, while taking advantage at L-M-C's level of the provisions of Code Section 311. See United States v. General Geophysical Co.,296 F. 2d 86 (5th Cir. 1961), cert. denied 369 U.S. 849 (1962). There the corporate taxpayer redeemed the stock of four shareholders in exchange for cash and certain depreciable assets. The same day the corporation reacquired the assets for corporate notes. The issue before the Court was whether the corporation was entitled to a stepped-up basis in the reacquired assets. The district court had *125 held that "[the] substance of [the] two transactions was exactly like the form they took" [6] and had allowed the corporation a stepped-up basis in the depreciable assets it had reacquired. On appeal the Government argued that the Court should disregard the form of the redemption and sale back and treat the transaction as a redemption of the corporate stock for cash and corporate notes, leaving the ownership and basis of the depreciable assets untouched. [7] The Court of Appeals for the Fifth Circuit agreed and refused to allow the corporation a stepped-up basis in the depreciable assets, stating: [the] transactions should be recognized as creating an interruption in the ownership of the assets sufficient to produce a new basis only when the corporation has made a clear and distinct severance of its ownership prior to the reacquisition. [8]
The Court then concluded that the corporation's retention of control of the transferred assets was so extensive as to preclude it from obtaining a stepped-up basis *126 in the assets. In reaching its conclusion, the Court relied on several factors: (1) the corporation parted with title to the property for only a few hours; (2) it made no physical delivery of the assets; (3)its control and use of the property was never interrupted; (4) there was a strong expectation that the legal title would be returned shortly; (5) the corporation was the only possible purchaser; and (6) the corporation never intended to cut down on its operations and part with the property. In General Geophysical, had the corporation been able to obtain a stepped-up basis in the property by means of a redemption and sale back, it effectively would have been able to deduct the cost of redeeming its own stock. This result would have occurred because the corporation recognized no gain on the redemption under section 311(a)(1). [9] Thus by using depreciable property with a low adjusted basis to redeem the stock of its shareholders, the corporation by means of the sale back had increased its basis in the property and was able to generate a deduction under section 167. *127 The facts herein differ from those in General Geophysical only in that, rather than repurchasing the property distributed in redemption of the stock of the retiring shareholder, L-M-C "leased" the property back. Thus, instead of generating a depreciation deduction as in General Geophysical, L-M-C attempted to generate a rental deduction. We are of the opinion that this distinction is immaterial where the "lease" was a sham and the redeeming corporation retains effective control and ownership over its transferred assets for their full useful life. The rationale of General Geophysical is equally applicable to the facts herein. All the factors cited by the Court in General Geophysical are present in the instant case. First, though L-M-C parted with legal title to the customer files, it simultaneously "leased" the files back for their entire useful life. Second, the customer files were never delivered to the estate. Third, L-M-C's control and use of the files was never interrupted. Fourth, the redemption agreement and "lease agreement" were executed simultaneously. Fifth, L-M-C would never have entered into the agreement were it not assured that the files would *128 be leased back to it. Finally, L-M-C did not intend to cut down on its operations and had no intention of parting with the property. In addition, once the expected tax treatment of the transactions was challenged by the Internal Revenue Service, L-M-C and the executor-trustee agreed to suspend the lease payments. In view of these factors, we conclude that the purported redemption and leaseback in fact constituted a redemption for cash and deferred payments. As a consequence, we conclude that L-M-C is not entitled to a deduction for rent under section 162. In view of our conclusion that the payments by L-M-C were payments for stock and not rent, we render moot the question whether the estate and trust would be entitled to amortized deductions for their purported interest in the customer files. Decision will be entered under Rule 155. Footnotes
1. The petitioner, George A. LaMair Residuary Trust, is a distributee of the Estate of George A. LaMair. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
3. George A. LaMir, II is decedent's son.↩
4. The payments during the calendar year 1970 were reported by the estate on its fiduciary returns as follows: January 1, 1970 to June 30, 1970
$ 15,780.79
July 1, 1970 to March 31, 1971
15,612.71
Total
$ 31,393.50 The payments during the calendar years 1971, 1972 and 1973 were reported by the trust on its fiduciary returns.↩
5. Section 162 provides in part: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
6. General Geophysical Co. v. United States,175 F. Supp. 208↩ (S.D. Tex. 1959). 7. 296 F. 2d at 87↩.
8. 296 F. 2d at 89↩.
9. If the transactions were implemented today, though they would ostensibly fall within the scope of section 311(d)(2)(A), the corporation would still recognize gain by reason of section 1245. Section 311(d) was added to the Internal Revenue Code of 1954 on December 30, 1969 and is effective for taxable years beginning after November 30, 1969. Section 905(a) and 905(c)(1)of the Tax Reform Act of 1969, P.L. No. 91-172, 83 Stat. 487, 713-714. Section 1245 was added to the Internal Revenue Code of 1954 on October 16, 1962 and is effective for taxable years beginning after December 31, 1962. Section 13(a)(1) of the Rev. Act of 1962, P.L. No. 87-834, 76 Stat. 960, 1032.↩