**Kenneth A. MURRY and Helen J. Murry, Petitioners-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**LAKESIDE GARDEN DEVELOPERS, INC., Petitioner-Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**Nos. 76–4415, 76–4416.**

United States Court of Appeals, Fifth Circuit.

Aug. 31, 1979.

Gilbert E. Andrews, Act. Chief, Appellate Section, U. S. Dept. of Justice, M. Carr Ferguson, Asst. Atty. Gen., Stuart E. Seigel, Chief Counsel, I. R. S., Gary R. Allen, Jeffrey S. Blum, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellant.

Robert O. Rogers, Palm Beach, Fla., for petitioners-appellees.

Eileen Trautman, Melvin N. Greenberg, Miami, Fla., for The Florida Builders & Developers Council, etc.

Before TUTTLE, TJOFLAT and HILL, Circuit Judges.

PER CURIAM:

We affirm the decision appealed from on the basis of the memorandum opinion of the Tax Court, which we attach as an appendix. In view of the comments offered by our brother in dissent, we wish to highlight the following aspects of the Tax Court's opinion.

The issue we are called upon to decide is a very narrow one. We have no doubts that, as an initial matter, the Commissioner has the power to look behind the form of a transaction to determine its true substance. Yet the Commissioner does not ask us to decide whether the transfer of title to the recreational facilities from the corporation to its stockholders at an artificially low price constituted a "bargain sale." Nor are we asked to consider whether the "excessive" rentals paid under the leases ought to be considered dividends, attributable to the corporation in the year in which they are paid. Instead, we are asked to embark upon a new course altogether, giving the Commissioner the authority to restructure a transaction into the transaction the Commissioner would deem more appropriate. Such authority in government would be wholly unprecedented.

The Commissioner contends that he should be allowed to capitalize the "excessive" portion of the rents paid under the recreational facilities leases and treat it as part of the purchase price of the condominiums.

In short, the Commissioner's position is that, when a taxpayer or related taxpayers, have entered into actual transactions, the Commissioner should be authorized to rule that the taxpayer ought not have made those particular transactions but should have entered into different transactions so that more immediately taxable income would result. Under this view, when the Commissioner determines that the taxpayer

has, in a bona fide transaction, minimized the tax consequences, Section 61 of the Internal Revenue Code authorizes the Commissioner to create the sort of transaction which would have maximized the taxable consequences and, having done so, to treat the taxpayer as if he had, indeed, entered into the transaction the Commissioner prefers.

In urging us to approve this approach, the Commissioner has been unable to point to *any* precedent supporting his position. The Commissioner's reliance on Section 61 of the Internal Revenue Code is misplaced, since the rents are paid to the stockholders and not the corporation. Furthermore, the Commissioner's reliance on Section 482 of the Code simply begs the question because the Commissioner has not established that he has the authority, in the first instance, to capitalize the value of the rents.

In the present case the parties have entered into a valid sale and leaseback of the recreational facilities. We cannot allow the Commissioner to disregard completely what has actually occurred between the parties. A transaction must be given its effect in accordance with what actually occurred and not in accordance with what might have occurred. *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 707 (1978). In view of the total dearth of authority supporting the Commissioner's position, we reject his attempt to restructure this particular transaction in the manner he seeks.

Nothing held here limits any authority of the Commissioner to pierce the apparent and to discover the real transaction, imposing taxes upon reality in lieu of sham. As mentioned, however, the Commissioner in this case has studiously avoided asking us to pass upon the exercise of any such authority in the treatment of the "bargain sale" of the recreational facilities from the corporation to its sole stockholders or the actual payment of dividends disguised as rentals.

These comments are consistent with and mere highlights derived from the memorandum opinion of the tax court, appendix.

## APPENDIX

## MEMORANDUM FINDINGS OF FACT AND OPINION

QUEALY, Judge:

Respondent determined deficiencies in the income tax of petitioners in the following amounts:

Kenneth A. Murry and Helen J. Murry—Docket No. 6034–73

| Year Ended | Deficiency | § 6651(a) | § 6653(a) |
|---|---|---|---|
| 12/31/66 | $27,924.56 | | |
| 12/31/67 | 41,217.84 | | |
| 12/31/68 | 55,090.85 | | |

Lakeside Garden Developers, Inc.—Docket No. 6035–73

| | | | |
|---|---|---|---|
| 6/30/66 | $54,009.60 | | |
| 6/30/67 | 98,252.27 | | |
| 6/30/68 | 79,556.65 | $19,889.16 | $3,977.83 |
| 6/30/69 | 23,863.60 | 5,965.90 | 1,193.18 |

As a result of the agreement by the parties, the sole issue to be considered for decision at this time is whether Lakeside Garden Developers, Inc., realized additional income under section 61 [2] from the sale of condominium residential units represented by the obligation, which the purchasers of those units were required to assume, to pay rentals under a 99-year lease for so-called recreational facilities which had been erected by Lakeside Garden Developers, Inc., and transferred to its stockholders. Depending upon the decision of the Court with respect to that issue, a further hearing may be necessary to determine the nature and amount of such income and the extent to which taxable to the shareholders of Lakeside Garden Developers, Inc.

## FINDINGS OF FACT

Some of the facts have been stipulated. Such stipulations and the exhibits attached thereto are incorporated herein by this reference.

During the taxable years in question, Kenneth A. Murry and Helen J. Murry were husband and wife having their principal place of residence at 2200 Lake Drive, Delray Beach, Florida. They filed a joint individual Federal income tax return, Form 1040, for each of the calendar years 1966, 1967 and 1968, with the Southeast Service Center of the Internal Revenue Service at Chamblee, Georgia.

During the taxable years in question, Lakeside Garden Developers, Inc., hereinafter called Lakeside, was a corporation having its principal place of business at 7340 South Military Trail, Lake Worth, Florida. For each of the fiscal years ending June 30, 1966, through June 30, 1969, it filed a United States corporation income tax return, Form 1120, with the Southeast Service Center of the Internal Revenue Service at Chamblee, Georgia.

Mr. Kenneth A. Murry had extensive experience in the construction industry. He entered into an agreement with Mr. Elias Breath and Mr. Harry W. Topal, who were to contribute the necessary capital to organize a corporation and to build and to sell condominium apartments. Pursuant to such agreement, on April 22, 1965, they caused Lakeside to be incorporated. Pursuant to the articles of incorporation, there were authorized 100 shares of common stock, of which 45 shares were issued to Kenneth A. Murry, 45 shares were issued to Elias Breath, and 10 shares were issued to Harry W. Topal. In January 1966, Harry W. Topal died and 5 of his shares were purchased by Mr. Murry and the other 5 shares were purchased by Mr. Breath, whereupon each became the owner of 50 shares of the 100 authorized and outstanding shares of Lakeside.

On May 22, 1965, Mr. Murry entered into a contract to acquire a parcel of land on which Lakeside was to construct the apartments. After a mortgage commitment was obtained, Lakeside took title to the land. The development plan contemplated the construction of 11 apartment buildings, to be sold as condominiums, clustered around a common recreational facility. It was further contemplated that the recreation facility would be held by the stockholders of Lakeside and leased to the condominiums

---

2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

under a 99-year lease, with all maintenance and other expenses incident thereto to be paid as a part of the condominium expenses. In other words, the owners of the recreation facilities would lease such facilities to the condominium owners under a 99-year net lease at a specified rent. The complex was to be known as "Lakeside Point Gardens."

The first condominium apartment building was nearing completion in January 1966. At a special meeting of its board of directors held on January 19, 1966, Lakeside was authorized to convey to Mr. Murry and Mr. Breath the specific real property on which the recreational facilities were being constructed. On January 27, 1966, Lakeside conveyed such property for a stated consideration of $6,000, receiving two notes in the amount of $3,000, one of which was executed by Mr. Murry and the other by Mr. Breath. At the same time, Mr. Murry and Mr. Breath each gave a note to Lakeside for one-half of the cost of the improvements on said properties, amounting to a total of $62,213.61, dated November 14, 1966.

On January 27, 1966, Lakeside also submitted a declaration of condominium for the first condominium building which was nearing completion. Simultaneously, Mr. Murry and Mr. Breath, individually, entered into a 99-year lease with the condominium owners association for this building whereby that association acquired a nonexclusive right to use the recreational facilities in exchange for a stated rental. The condominium owners association was comprised of the owners of all the units in the apartment building. At the time the 99-year lease was entered into, the owner of such units was Lakeside.

Periodically through the next three calendar years, each of the other ten condominium apartment buildings at the Lakeside Point Gardens complex, together with the land on which it was situated, was submitted to condominium ownership. Simultaneously with the submission of each building to condominium ownership, the condominium owners association for each building (Lakeside) entered into a long-term lease with Mr. Murry and Mr. Breath, giv-

ing that association a nonexclusive right to use recreation facilities in exchange for a stated payment. Each lease provides, in part, as follows:

24. LESSEE DOES NOT HAVE EXCLUSIVE RIGHT OF POSSESSION. This lease does not grant to the Lessee the exclusive right of possession to the demised premises. The Lessee understands and agrees that the Lessor shall have the right to make and enter into similar lease arrangements with others, including corporations or apartment house projects under the condominium or cooperative format, and said Lessee will have equal rights to the possession, use and occupancy of the demised premises and each and every part thereof. Notwithstanding the fact that the Lessor may contract with other lessees for the possession, use and occupancy of the demised premises, as above set forth, the obligation to pay the rent in the sum provided and specified hereinabove in this lease and any of the other obligations due and to become due hereunder shall continue as the sole obligation of the Lessee herein, its successors and assigns, without diminution, reduction or abatement because of the leasing to other lessees of the demised premises, or for any cause or reason whatsoever, and the liability for the payment of rent and any of the other obligations due and to become due hereunder may not be avoided by waiver of the use, enjoyment or abandonment of the leased premises or any part thereof.

The members of each condominium owners association were the owners of the condominium apartment units to which that association related. At the time each 99-year recreation lease was executed, Lakeside owned all of the units.

Mr. Murry and Mr. Breath constituted two of the first three directors of each condominium owners association. Additionally, Mr. Murry was president of each association and Mr. Breath was vice-president and secretary-treasurer.

For the fiscal years ending June 30, 1966, through June 30, 1969, Lakeside was en-

gaged in selling condominium units at the Lakeside Point Gardens complex. As part of the sale of an individual unit, the purchaser was required to execute a retail purchase agreement for the purchase of his condominium unit. In purchasing an individual unit, the purchaser acquired an interest in a proportionate part of the real property on which the condominium building was constructed.

To purchase a condominium unit at the Lakeside Point Gardens complex, the purchaser was required to pay a stated sales price for the unit as well as assume certain obligations under the declaration of condominium for the particular building in which the purchaser was purchasing a unit, including an obligation for a proportionate share of the 99-year recreation lease which the condominium owners association for that particular building had entered into with Mr. Murry and Mr. Breath. These obligations were set forth in the purchase agreement. No one could purchase a condominium unit at the Lakeside Point Gardens development without assuming these obligations.

The recreation area leased by the condominium owners association under the 99-year recreation lease was part of the common elements of the Lakeside Point Gardens development. The maintenance and operation of the common elements, including the recreation facilities, was the responsibility of the condominium owners associations and was a common expense. The common expenses included the expense of administration, maintenance, operation, repair and replacement of the common elements including the premises leased by the condominium owners association under the 99-year recreation lease.

A purchaser of the condominium unit at Lakeside Point Gardens agreed to be bound by the declaration of condominium and the 99-year recreation lease. As such, he agreed to be liable for his proportionate share of the common expenses including his proportionate share of the maintenance of the recreation area and the rent due under the 99-year recreation lease.

Messrs. Murry and Breath, as lessors, had a lien on the interest of the condominium owners association as lessee. The condominium owners association also had a lien on each condominium apartment for any unpaid assessments and a lien on all tangible personal property located within the apartments, including the amount advanced on behalf of an apartment owner in payment of his obligation under the long-term lease.

The average stated sales price per residential unit sold by Lakeside for the fiscal years ending June 30, 1966, through June 30, 1969, was as follows:

| | |
|---|---|
| 6–30–66 | $ 9,993.48 |
| 6–30–67 | 12,351.57 |
| 6–30–68 | 10,816.72 |
| 6–30–69 | 15,510.67 |

For the four years before the Court, Lakeside had a net operating loss from the sale of condominium units, without consideration of the recreation leases, of $17,279.91.

Pursuant to the recreation lease, the monthly rentals allocable to each unit in the apartment complex ranged from $15.00 to $24.00. The annual recreational lease rentals from the 11 apartment buildings in the complex totaled $65,280.00.

## OPINION

In these cases, the individual taxpayers proposed to acquire a tract of land for development as condominium apartment buildings. Lakeside was formed to act as developer. Kenneth A. Murry thereupon entered into an agreement to buy the land on behalf of Lakeside. Upon obtaining a commitment for a construction loan, Mr. Murry then transferred the land to Lakeside. Under Mr. Murry's direction, Lakeside proceeded with the construction of 11 condominium apartment buildings, clustered around a so-called "recreational facility."

When the first apartment building was near completion, Lakeside conveyed the "recreational facility," which comprised a portion of the land and the improvements

thereon, to Mr. Murry and his associate (the sole stockholders of Lakeside) at cost. Lakeside then submitted the building to condominium ownership, forming a condominium owners association in which Lakeside, as then owner of all the apartments, was the sole member. The association then entered into an agreement to lease the recreational facilities for a period of 99 years at a stated rental.

As each of the remaining buildings were completed and submitted to condominium ownership, Lakeside would enter into an identical lease for the common recreational facilities.

When the condominium apartments were sold by Lakeside to the individual owners, each was required to assume, as part of the common charges to the apartment owner, the obligation to pay an allocable share of the amount due under the 99-year leases on account of the recreational facilities. The obligation constituted a lien enforceable against the interest of the owner of the apartment.

The respondent has determined that Lakeside realized income upon the sale of each apartment or unit in the condominium complex measured by the difference between the allocable cost of the unit to Lakeside and the consideration received by Lakeside for the sale of such apartment, including the present value of obligation assumed by the purchaser to pay a rental under the 99-year lease of the recreational facility to the extent that such rental was "excessive."[3] By "excessive" the respondent means the amount by which the rentals for the recreational facilities exceeded a "fair rental" for such facilities, which the respondent determined to be 10 percent of the cost of the facilities. The respondent would treat the present value of the obligation of the ultimate purchasers to pay "ex-cessive rentals" over the 99-year term, as income to Lakeside in the first instance, and as a dividend to its stockholders. Cf. *Southern Ford Tractor Corporation*, 29 T.C. 833 (1958); *Fontana Power Co. v. Commissioner*, 127 F.2d 193 (9th Cir. 1942).

Petitioner argues that the rental which the individual condominium purchasers assumed was paid pursuant to a 99-year lease of the recreational facilities and, as such, cannot be attributed to Lakeside as a part of the purchase price of the condominium. While it must be assumed for the purposes of this decision that the rentals were excessive in relation to the cost of the recreational facilities, petitioner contends that the amounts paid nonetheless constituted rent, chargeable solely to the owners of the recreational facilities, citing *Welsh Homes, Inc.*, 32 T.C. 239 (1959), affd. 279 F.2d 391 (4th Cir. 1960); *Estate of Ralph W. Simmers*, 23 T.C. 869 (1955), affd. 231 F.2d 909 (4th Cir. 1956); *Morris Lipsitz*, 21 T.C. 917, 936 (1954), affd. 220 F.2d 871 (4th Cir. 1955).

For purposes of this decision, the parties have agreed that there was a preconceived plan whereby the individual condominium units to be sold by Lakeside would first be burdened with an obligation to pay excessive rentals to the stockholders of Lakeside on account of the 99-year lease of the recreational facilities, in order to provide the stockholders of Lakeside with a continuing income in the form of rents. Such transactions between a corporation and its sole stockholders need not be given effect for tax purposes. *Green v. United States*, 460 F.2d 412 (5th Cir. 1972); *Riss v. Commissioner*, 478 F.2d 1160 (8th Cir. 1973), affg. 56 T.C. 388 (1971); *Waldheim v. Commissioner*, 244 F.2d 1 (7th Cir. 1957), affg. 25 T.C. 839 (1956); *58th St. Plaza Theatre, Inc. v. Commissioner*, 195 F.2d 724 (2nd Cir. 1952), affg. 16 T.C. 469 (1951).

---

3. In his brief, the respondent's position is summarized as follows:

Section 61 of the Internal Revenue Code of 1954 (hereinafter referred to as *Code*) provides that a taxpayer is required to include in gross income gains derived from dealings in property. The amount of gain is the difference between the amount realized and the adjusted basis in the property sold. *Code* § 1001(a); Treas.Reg. §§ 1.61–6(a), 1.1001–1(a). The amount realized is the sum of any money received plus the fair-market value of any property other than money received. *Code* § 1001(b). This case involves the question of other property received on the sale of condominium units.

The Court thus would sustain the right of the respondent to look to the substance of the transactions involved in this proceeding for purposes of determining the resulting tax liabilities of the parties. Cf. e.g., *Smith v. Commissioner*, 537 F.2d 972 (8th Cir. 1976); *Waterman Steamship Corporation v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), cert. denied 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219; *United States v. General Geophysical Company*, 296 F.2d 86 (5th Cir. 1961); see also *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949). In so doing, the respondent was presented with several possible courses of action.

Respondent could have determined that the recreational facilities coupled with the 99-year lease, which Lakeside as sole owner of the apartments entered into contemporaneously with the sale of the recreational facilities to its stockholders, gave rise to a "bargain sale" and a resulting distribution by the corporation to its stockholders at that time. Cf. *Palmer v. Commissioner*, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937); *Riss v. Commissioner, supra; Green v. United States, supra; Waldheim v. Commissioner, supra*. However, the parties have disaffirmed any intention to raise that issue.

In the alternative, the respondent could have determined that the sale of the recreational facilities by Lakeside to its stockholders, accompanied by a lease-back of those facilities for an excessive rental resulted in the payment of dividends in the form of excessive rents. Cf. *Southern Ford Tractor Corporation, supra*. When the individual purchaser of the condominium assumed the obligation of Lakeside, the owner of the apartments when the 99-year lease was made, to pay such "dividends," the rentals thus paid would be taxable to Lakeside in the first instance. See *United States v. Joliet & Chicago R. Co.*, 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658 (1942); *A. B. C. D. Lands, Inc.*, 41 T.C. 840 (1964). Lakeside would, in turn, be permitted to deduct a reasonable rental and any excess would be treated as a dividend. *58th St. Plaza Theatre, Inc. v. Commissioner, supra; Limericks, Inc.*, 165 F.2d 483 (5th Cir. 1948), affg. 7 T.C. 1129 (1946).

Both in his notice of deficiency and in the presentation of the case to the Court, respondent has not sought to assert either of the aforementioned alternatives. For that reason, the Court is not called upon to consider such characterizations of these transactions for tax purposes. Regardless of the merits of those alternatives, we find no basis in the law for the corrective action sought here by the respondent.

Respondent would treat the present value of the obligation, assumed by the ultimate purchaser of these condominium units to pay so much of the rents for the recreational facilities, which may be considered "excessive," as part of the consideration received by Lakeside from the sale of such units. Respondent argues that this characterization of the facts represents the substance of the transaction for tax purposes.

Respondent points out that the purchasers of the individual condominium units were not in a position to negotiate with respect to the rentals to be paid for the recreational facilities. Hence, there was no "arms-length" negotiation to fix the amount of such rentals. While this may be correct, it must also be recognized that these particular units were not the only condominiums available for purchase in the Fort Lauderdale area. If the purchasers were not willing to rent recreational facilities, they could have purchased other condominiums which were not burdened with recreational leases. Furthermore, the so-called "excessive rentals" resulted from the fact that the 11 buildings were completed and sold out. It may well be from the standpoint of the individual purchasers the monthly charge was a reasonable fee for the use of the facilities.

It is not uncommon for developers to incur costs for other land and improvements such as water and sewage systems, roadways, recreation areas and the like for the benefit of the development as a whole. Where the developer either dedicates such facilities for general use or transfers such facilities to the purchasers of the individual

properties within the development for the purpose of inducing customers to buy such properties, such expenditures become a part of the cost of the properties to be sold. On the other hand, where the developer does not dedicate such facilities to the exclusive use of the property owners, but instead elects to make the facilities a commercial venture in and of itself, the cost of the facilities does not become a part of the basis of each property sold. *Willow Terrace Development Co. v. Commissioner*, 345 F.2d 933 (5th Cir. 1965); *Gersten v. Commissioner*, 267 F.2d 195 (9th Cir. 1959); *Milton J. Noell*, 66 T.C. 718 (1976); *Derby Heights, Inc.*, 48 T.C. 900 (1967); *Colony, Inc.*, 26 T.C. 30 (1956), affd. on other issues, 244 F.2d 75 (6th Cir. 1957); *Country Club Estates, Inc.*, 22 T.C. 1283 (1954).

While the recreational facilities in this case may have been constructed, in part, for the purpose of inducing customers to purchase condominium units, the lessor of these facilities retained complete control over their future use and development. Under paragraph 24 of the long-term "lease" between the condominium association and the owners of the recreational facilities, the owners merely gave the association a nonexclusive right of possession. The owners specifically reserved the right to make and enter similar lease arrangements with any "others." [4]

By virtue of the complete control which the owner of these recreational properties reserved over their future use and development, the rights retained by the lessor would have precluded inclusion of the cost of such facilities in the basis of the condominium units. Since the cost of the recreational facilities could not be considered a part of the cost of the project, the cost of these facilities would not have been recoverable, for tax purposes, from the sale of the condominium units. Cf. *Frank B. Cooper*, 31 T.C. 1155 (1959). To include the present value of the excessive rentals from these facilities as a part of the proceeds of the sale of the condominium units would thus be contrary to the rationale of *Willow Terrace Development Co. v. Commissioner, supra; Gersten v. Commissioner, supra; Milton J. Noell, supra; Derby Heights, Inc., supra; Colony, Inc., supra; Country Club Estates, Inc., supra* and similar cases.

The position of the respondent in this case is bottomed on the proposition that the obligation to pay "excessive rentals" had a present value and that such value was taxable to Lakeside as a part of the proceeds of the sale of the individual units. The mere fact that the obligation has a present "value" does not warrant the adoption of this theory. There is little question that the obligation of any lessee to pay rent under a 99-year lease has a present value. But to attempt to tax the value of such a leasehold at the time that the lease is entered into, or when such obligation is assumed by a third party, would run directly counter to what has been the accepted practice, and presumably the law, since the first revenue act. *Welsh Homes, Inc., supra; Estate of Ralph W. Simmers, supra; Morris Lipsitz, supra.*

In the alternative, the respondent contends that the "value" of the obligation to pay the "excessive rentals" as of the date that such obligation was assumed by the individual purchasers of the condominium units should be allocated to Lakeside pursuant to section 482. If such "value" does not constitute income in the first instance, there is nothing to allocate.

For the reasons stated herein, and *solely* on the basis upon which the proceeding was submitted to the Court,

*Decisions will be entered for the petitioners.*

TUTTLE, Circuit Judge, dissenting:

With deference, I dissent. I am unable to understand how the Tax Court reached its conclusion disallowing the additional taxes

---

4. There was no "lease" in the strict sense. When each condominium association undertook its obligation to pay its share of the rent under the so-called 99-year lease, and each individual purchaser assumed his pro rata share of that obligation, all he acquired was the privilege of sharing in the maintenance and use of the recreational facilities. This privilege is more analogous to a membership in a private club than ownership of a leasehold interest.

in light of its statement that "For purposes of this decision, the parties have agreed that there was a preconceived plan whereby the individual condominium units to be sold by Lakeside would first be burdened with an obligation to pay excessive rentals to the stockholders of Lakeside on account of the 99-year lease of the recreation facilities, in order to provide the stockholders of Lakeside with a continuing income in the form of rents."

The Tax Court had before it only a question of law arising from stipulated facts. I summarize the facts.

Briefly stated, the facts are that the taxpayer and another jointly owned all of the stock of the corporation Lakeside Garden Developers, Inc. They confected a plan to build 11 buildings, each containing a number of condominiums to be sold to the public. During the course of the construction, two individual stockholders, who were also the only officers of the corporation, acquired from their corporation sufficient land to enable them to build on it what is known as "recreational facilities." These recreational facilities would be totally surrounded by the condominium units and it was part of their plan that every condominium purchaser, in addition to paying the price of his own unit would also be required to pay a proportionate part of a 99 year recreational lease which the condominium owners association for his unit had entered into with taxpayers-stockholders. The stockholders' total outlay for the land and buildings used for recreational purposes amounted to $68,213.61. The annual rental from the condominium owners association's 99 year leases equaled $65,280.00, a 95.7 percent return each year on the stockholders' total investment in these facilities. Significantly, the corporation showed a loss on two of the years and a small gain on the remaining two of the four years under review.

To such an arrangement, which eliminated substantially all net income to the corporation and resulted in very substantial income directly to the stockholders, which but for the relationship between the corporation and its owners would in all likelihood have belonged to the corporation, the Internal Revenue Service cries "foul." The commissioner says that this is a "tie-in" situation. It is as if a corporation with a single stockholder was selling automobiles to the public by requiring a sale for a total of $7,500 to be accomplished by the corporation's selling the automobile for $6,500 only on condition that the purchaser would buy a fountain pen at the same time for $1,000, the pen to be supplied by the stockholder and the $1,000 received by him to be free of corporate taxes.

To me the situations are hardly distinguishable. I agree with what the Tax Court said in its opinion:

For purposes of this decision, the parties have agreed that there was a preconceived plan whereby the individual condominium units to be sold by Lakeside would first be burdened with an obligation to pay excessive rentals to the stockholders of Lakeside on account of the 99 year lease of the recreational facilities, in order to provide the stockholders of Lakeside with a continuing income in the form of rents. *Such transactions between a corporation and its sole stockholders need not be given effect for tax purposes.* Citing *Green v. United States,* 460 F.2d 412 (5th Cir. 1972); *Riss v. Commissioner,* 478 F.2d 1160 (8th Cir. 1973); *Waldheim v. Commissioner,* 244 F.2d 1 (7th Cir. 1957); *58th St. Plaza Theatre, Inc. v. Commissioner,* 195 F.2d 724 (2d Cir. 1952).

The Tax Court then said:

The court thus would sustain the right of the respondent to look to the substance of the transactions involved in this proceeding for purposes of determining the resulting tax liabilities of the parties. Citing among others *Waterman Steamship Corp. v. Commissioner,* 430 F.2d 1185 (5th Cir. 1970), cert. denied 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219; *United States v. General Geophysical Co.,* 296 F.2d 86 (5th Cir. 1961).

All of these cases stand for the proposition which we stated in *Kanawaha Gas & Utilities Co. v. Commissioner of Internal Revenue,* 214 F.2d 685 (5th Cir. 1954):

In determining the incidence of taxation, we must look through form and search out the substance of a transaction. * * * This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not separate.

214 F.2d at 691.

The Tax Court then, however, instead of viewing the series of transactions as a unit, undertook to point out what other steps the commissioner might have taken but which he did not take in this case. The Tax Court pointed out that:

Respondent could have determined that the recreational facilities coupled with the 99 year lease which Lakeside as sole owner of the apartments entered into contemporaneously with the sale of the recreational facilities to its stockholders, gave rise to a 'bargain sale' and a resulting distribution by the corporation to its stockholders at that time.

The court then said that in the alternative, the IRS could have determined that the sale of the recreational facilities by Lakeside to its stockholders, accompanied by a lease back of those facilities for an excessive rental resulted in the payment of dividends in the form of excessive rents. Pointing out that the IRS has not sought to assert either of these alternatives, the court then inexplicably decided that the commissioner is not entitled to have the transactions recast in the manner which he asserted—that to the extent that the monthly payments by the condominium purchasers were excessive, the agreement by the condominium purchaser to pay the excessive rent must be considered as "other property" received on the sale of the condominium which should be valued as of the time of sale and should be added to the purchase price.

Once it is clear that the transaction between the related corporation and its sole stockholders can be reconstructed, there appears to be no reason why the commissioner should not prevail.

Section 1001 of the Internal Revenue Code makes clear what is to be done with respect to an agreement by the purchasers of real estate to make future payments. This section provides:

*The amount realized* from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money received) . . . .

Here, upon a recasting of the transaction, as the Tax Court said is permissible, we find that the corporation would have received the monthly obligation of the condominium purchaser to make the excess payment for the recreational facilities. This obligation to make the monthly payment is part of the "property received." upon the sale. It must be valued and added to the amount realized from the sale.

In reaching the conclusion that the present cash value of the excessive amount of the monthly payments for the use of the recreational facilities [1] must be added to the amount of the sales price received by the corporation, I do not think it is necessary to rely on § 482 of the Internal Revenue Code providing for "Allocation of income and deductions among taxpayers." I am of the view that the general rule provided in § 61 of the Code defining gross income as including "(3) Gains Derived From Dealings in Property" is sufficient, when viewed with the requirement that we look to substance rather than form, to require that judgment be rendered for the Internal Revenue Service.

If the substance of the transaction as I have outlined cannot be thought to be sufficient to place the excess rents paid directly to the stockholders within the corporation's

1. It must be borne in mind that the Tax Court has found that the parties contemplated that there would be an excessive charge in some amount.

income, as I have indicated, then I would agree with the IRS that § 482 would fit the case like a glove. That section [2] is designed to enable the commissioner to allocate income between two or more affiliated organizations in order to prevent evasion of taxes or clearly to reflect the income of such organizations. When he undertakes to make such apportionment, the commissioner's action is reviewable only if his determination is arbitrary and capricious and by a showing as to what the correct allocation should have been. *Engineering Sales, Inc. v. United States*, 510 F.2d 565 (5th Cir. 1975). The appropriate regulations make clear the scope and purpose of this section. Section 1.482–1 of Treasury Regulations on Income Tax (1954, 26 C.F.R.) provides:

*Scope and purpose.* (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. *If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group shall determine the true taxable income of each controlled taxpayer.* The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. (emphasis added.)

The Tax Court having recognized that the parties conceded that there was excessive rental charge for the recreational facilities and the court having recognized that that condition was a part of the preconceived plan, I am convinced that the Tax Court erred in its determination that the part of excess income that was agreed to be paid over the period of the lease should not be valued and added to the purchase price paid for the individual condominiums.

I would reverse the holding of the Tax Court.

---

**2.** In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegates may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.