KENNETH A. MURRY and HELEN J. MURRY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Murry v. Commissioner
Docket Nos. 107-76, 108-76, 109-76, 110-76.
United States Tax Court
T.C. Memo 1984-670; 1984 Tax Ct. Memo LEXIS 5; 49 T.C.M. (CCH) 403; T.C.M. (RIA) 84670; December 27, 1984. *5 Timothy H. Kenney, for the petitioners. Sergio Garcia-Pages, for the respondent. RAUM MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies and additions to tax in these consolidated cases: Additions to Tax,
Docket
Year
I.R.C. 1954
Sec.6651(a)
Name
No.
Ending
Deficiency
Sec.6653(a) Sec.6655
Kenneth A.
107-76
12/31/69
$57,853.98
$2,892.70
Murry and
12/31/70
208,955.57
10,447.78
Helen J. Murry
12/31/71
563,750.69
$140,937.67
28,187.53
12/31/72
3,078.50
370.48
153.93
Lakeside
Garden
108-76
6/30/71
37,143.20
9,285.80
1,857.16
$614.39
Developers,
Inc.
Kenneth A.
109-76
12/31/73
8,311.95
415.60
Murry
KAM Construc-
110-76
1/31/72
15,646.03
3,911.51
782.30
tion, Inc.
1/31/73
2,618.06
654.52
130.90
1/31/74
122,585.10
30,646.28
6,129.26
3,491.17
1/31/75
5,554.10
1,388.53
277.71
113.22
After concessions, the only issue remaining for adjudication is whether, on this record, the individual petitioners in docket No. 107-76 or their wholly-owned *6 corporation, the corporate petitioner in docket No. 110-76 should be considered the seller of certain income-producing assets owned by one of the individual petitioners and transferred by him to that corporation for the purpose of consummating the sale already substantially agreed to by him and the purchaser. FINDINGS OF FACT Some of the facts have been deemed stipulated pursuant to a stipulation proposed by respondent under Rule 91(f), Tax Court Rules of Practice and Procedure, and some of the facts have been stipulated by express agreement of the parties. The stipulations and attached exhibits are incorporated herein by reference. Since 1957, petitioner Kenneth A. Murry (Murry) has been a general contractor in the building industry. As such, he has built 998 condominiums, 787 single-family homes, a 60-unit cooperative building and a 30-unit rental apartment building. His profit from such building activities was often attributable, not to gain on the sale of the constructed property, but rather to related ground rents, management contracts, and leases of recreational facilities associated with the property. In fact, most of the assets the sale of which are in *7 issue herein involved the disposition of his interests in such profitable collateral arrangements. The individual petitioners, Murry and his then wife, Helen J. Murry, owned 100 percent of the stock of the corporate petitioner, KAM Construction, Inc. (KAM), [2] a Florida corporation engaged in the business of constructing and selling condominium apartments. Sometime during its fiscal year ended January 31, 1970, KAM commenced the development of Murry Hills Garden Apartments (Murry Hills), a condominium apartment project consisting of 518 units contained in 22 buildings on approximately 20 acres of land in Palm Beach, Florida. Although the corporation owned the land on which the project was constructed and marketed the condominiums to the ultimate purchasers, actual construction was performed by Murry, who alone had a license as a contractor. The corporation financed the project through preconstruction sales of the condominium units and construction loans from First Federal Savings and Loan of Lake Worth, Florida (First Federal). The preconstruction sales were made at prices based upon an estimate of construction cost plus a slight, but reasonable, profit. The construction *8 loans were secured by a mortgage on the Murry Hills land and the condominium buildings, and enjoyed a higher priority to these assets than that of the condominium unit purchasers. The mortgage notes evidencing the construction loans were signed twice by each of the individual petitioners -- once in their capacity as officers of KAM and once "individually". As part of the Murry Hills project Murry, acting in his individual capacity, along with Tom and Helen Smith, the former owners of the land upon which Murry Hills was constructed, developed a recreation facility which included three "recreation" buildings, "a large pool and patio area, ten shuffleboard courts, putting green, and paved parking area for boats and trailers" on cartain land adjacent to and integrated with Murry Hills (the Murry Hills Recreation land). [3] They retained ownership of the Murry Hills Recreation land and arranged to lease it to Murry Hills Association, Inc., the Murry Hills condominium association, for a term of 99 years (the Murry Hills facilities lease). It was through the *9 fees generated by this lease that Murry expected to profit from Murry Hills. The lease was expected to net him $45,500 annually. Murry also expected to profit from Murry Hills through fees generated by a management contract between Murry Hills Association, Inc., and Murry Hills Management Corporation, his wholly-owned corporation (the Murry Hills management contract). This contract, which had a term of 20 years, was anticipated to provide an annual net profit of approximately $25,000. Construction was begun on Murry Hills in the summer of 1969. By the end of that year, even before "models" had been constructed, KAM had sold approximately 70 percent of the proposed units, *10 and by the end of 1970 it had sold virtually all of the units. The selling effort was so successful because Murry Hills was adjacent to Lakeside Point Gardens, a highly regarded recently completed project of Murry's upon which Murry Hills was closely patterned. [4]
Sometime in early 1970, but at least by the summer of that year, Murry recognized that Murry Hills faced financial difficulty. As noted above, KAM had made preconstruction sales at prices based upon the then estimated cost of construction. However, after KAM made these estimates, construction costs in Palm Beach County increased substantially. Thus, the proceeds from the fixed rate sale contracts were insufficient to pay materialmen and subcontractors, [5] and to repay the First Federal construction loans. *11 By the end of 1970, Murry Hills was "basically" completed. All but two of its buildings had been built and those two were practically finished. Indeed, a number of "owners" had moved into their units, albeit without having received deeds. There were some 178 "owners" who had paid for their condominiums in full but who had not yet received deeds. It was not possible to give them clear deeds, since the construction loan mortgages and the recorded liens of the unpaid subcontractors and materialmen had priority. At about this time, "it became obvious" to Murry that Murry Hills faced a loss "well in excess of a million dollars". He thereafter advised the Smiths, the one-half owners of the Murry Hills Recreation Land and facilities lease, of the loss and they, in turn, informed their lawyer, who also was the attorney for First Federal and at sometime not disclosed by the record became its Chairman of the Board.Thus, First Federal learned of what was to be characterized as the "Murry Hills problem". During the first week of January 1971, Murry met with the president of First Federal to discuss the Murry Hills problem. At that meeting he estimated that the projects' cash *12 deficiency was approximately $360,000, an amount he felt he could raise by selling his interests in the Murry Hills facilities lease and in similar recreation facilities leases which he had entered into as part of the development of Lakeside Point Gardens (the Lakeside facilities leases). The Lakeside facilities leases were 99-year leases between Murry and others, as lessors, and Lakeside Garden Developers, Inc., and the 11 condominium associations at Lakeside Point Gardens, as lessees, which allowed the lessees the use of certain recreation facilities which were adjacent to the development. Murry owned a one-half interest in the land upon which the facilities were located (the Lakeside land) and somewhat more than a one-half interest in the rents generated by the leases. His interest in the rents resulted in annual profits to him of about $36,258. It soon became apparent that Murry had underestimated the magnitude of the Murry Hills problem. As it evolved, it had four major facets: (1) KAM was unable to pay subcontractors and materialmen; (2) it was unable to repay the construction loans obtained from First Federal; (3) by reason of its inability to pay off the construction *13 loans and satisfy other prior liens, it was unable to give deeds of clear title to purchasers of the units; and (4) KAM was unable to complete the two unfinished buildings. By January 11, 1971, Murry determined that it would take approximately $1,500,000 to "correct the problem". First Federal estimated the cost to correct the problem at about $1,691,000, computed as follows: [6]
Principal and interest owed
$1,646,000 First Federal (as of 4/1/71)
Cost to complete two unfinished
58,200 buildings
Past due bills
282,000 Outstanding loan related to
192,800 Lakeside leases [7]
Closing costs
12,000 $2,191.000 LESS: Cash due on preconstruction
sales, funds in escrow
(500,000)
"Cost" of Murry Hills problem
$1,691,000 The parties then embarked on a search for a plan which would save the project and avoid bankruptcy proceedings. *14 The negotiations which ensued with respect to the Murry Hills problem focused basically on two alternatives for raising the necessary cash: a loan against or the sale of some or all of Murry's income-producing assets. This group of assets included not only the stock of Murry Hills Management Corporation and the Murry Hills and Lakeside facilities leases and land, but also Murry's one-half interest in an unrelated so-called Palm Beacher property, namely, his one-half interest in the land and a 99-year lease of such land, upon which a cooperative apartment building (the Palm Beacher Apartments) was located. His net annual rentals from the Palm Beacher lease were approximately $8,715. Murry first attempted to raise the cash necessary to solve the Murry Hills problem by selling some or all of his income-producing property to parties other than First Federal. This attempt was unsuccessful, however, since the "cost of the problem" far exceeded the market value of the assets available for sale. Another proposal for raising the funds necessary to solve the Murry Hills problem involved First Federal making a "substantial" loan to Murry and one of his associates, secured *15 by Murry's interests in certain assets, including the Palm Beacher ground lease, the stock of Murry Hills Management Corporation and the Murry Hills and Lakeside facilities leases. This plan was contingent upon the Smiths' pledging their interest in the Murry Hills facilities lease and agreeing to allow the use of their share of the income from the lease to reduce the loan principal. The Smiths were not so willing and, because of this and "other reasons" the loan concept was abandoned. The proposal for alleviating the Murry Hills problem which was eventually adopted was a plan whereby First Federal would purchase all of Murry's income-producing assets. Sometime around March 25, 1971, First Federal offered to purchase such assets "provided that additional funds were raised through various other sources". The intended "other sources" included other creditors and lienholders and the apartment unit purchasers. The other creditors and lienholders were asked to accept less than full payment on amounts owed to them by KAM; the apartment unit purchasers were asked to make certain "contributions" over and above the amount they had paid or originally agreed to pay for their units. *16 Sometime around April 5, 1971, First Federal made a "tentative commitment" to "provide $1,400,000 towards the correction of the Murry Hills problem" by purchasing "various leases and the Murry Hills Management Corporation from Mr. Murry for $1,300,000" and lending the individual petitioners "$100,000 against the equity in their remaining assets". The $100,000 loan was to be used to reduce a loan related to the Lakeside leases. During the negotiations with respect to First Federal's purchase offer certain collateral issues were discussed. One such issue concerned First Federal's demand that Murry immediately assign, or at least cede "control" over, his income-producing assets to it. Murry objected, indicating that the sale "should * * * be handled like any other closing", but he was willing to place the income from the assets in trust with the understanding that such funds would be turned over to First Federal if the projected sale were consummated or returned to Murry if the plan failed. Another issue negotiated was Murry's request that First Federal assure him that the purchase plan would not cause him any "substantial tax problems". First Federal opposed this *17 demand, instead suggesting that Murry "promptly get the opinion of his tax consultant so that he will know whether or not he wants to proceed" with the purchase plan. Indeed, First Federal's April 5 "commitment" was "without regard to whether or not Mr. Murry has a tax problem". Notwithstanding the discussions regarding the different concerns of the parties, once they had focused upon the purchase plan, neither party ever abandoned it. On April 16, 1971, First Federal made a written offer to Murry to purchase for the sum of $1,300,000 his interests in "the recreation leases on Murry Hills * * * the management contract of Murry Hills * * * the recreational lease on Lakeside Point Gardens [and] * * * the lease of the Palm Beacher". It also offered to lend him $100,000 "upon the security of a mortgage on your home and all other assets owned by you and your wife".It further undertook to pay Murry $500 a week for his continued services and to pay Murry's legal expenses within specified limits. First Federal's proposal was contingent upon "the streams of income from Murry Hills Management Corporation and the recreational area, Lakeside Point Gardens recreational leases and the Palm *18 Beacher leases [being] * * * immediately diverted to some form of Trust to be made available for the solution of the 'Murry Hills problem'". First Federal required that Murry accept its offer, in writing, by April 21, 1971. By letter dated April 20, 1971, Murry, through his attorney, stated that "Murry will be willing to sell the assets named [in First Federal's offer] * * * for the sum of $1,400,000". He further agreed to "immediately" divert the income with respect to the income-producing assets to an "account". Additionally, he promised to "waive" his requirement that a "ruling from the Internal Revenue be secured regarding his tax liability on this sale" in exchange for First Federal's "waiving the $100,000 mortgage and increasing the purchase price to $1,400,000" [8]. He thus accepted First Federal's offer involving a sale by him of his income-producing assets to First Federal, but he attached conditions to that acceptance and characterized it as "an effort to compromise". *19 By letter dated April 21, 1971, First Federal responded to Murry's April 20, 1971, letter, stating that Murry's letter "does not constitute written acceptance of our offer" and that, since the time to accept the offer had expired, it thus "constitutes a rejection" of the offer. The letter was hand delivered to Murry who then orally requested and was granted a one-day extension, to "8:00 P.M. * * *, April 22, 1971", to accept the offer. On April 22, 1971, Murry and his attorneys met with the representatives of an accounting firm to discuss the tax consequences of First Federal's purchase offer. It was concluded that in order to minimize Murry's tax liability, the following steps "should be taken, in chronological order": * * * (2) Mr. Murry should make a contribution to capital [to KAM] of * * * [his income producing property] * * * * * * (4) [KAM] * * * should then negotiate with First Federal * * * for the purpose of refinancing its loans, secured by the property now held by [KAM] * * * (5) [s]hould agreement on refinancing fail to materialize, attempts to find a purchaser of some of the assets * * * should be commenced * * * [and] (6) [i]f *20 a purchaser of the above-mentioned assets cannot be found, negotiations with First Federal * * * should be commenced with the possibility of their purchasing certain assets from * * * [KAM]. Later that day, Murry's attorney telephoned the First Federal officer in charge of the Murry Hills problem and accepted "First Federal's offer as outlined in * * * [the] letter of April 16, 1971", including the proposal that income with respect to the assets be placed in trust. However, the attorney stated that "for tax reasons", it was Murry's current plan first to transfer all assets being purchased to KAM and that he would like the assets to "stay there" for a minimum of one week. First Federal had no objection to purchasing the assets through KAM and, accordingly, the parties began preparations for formally closing the sale. After April 22, 1971, moneys paid pursuant to the Murry Hills management contract, the Murry Hills and Lakeside facilities leases, and the Palm Beacher ground lease were deposited in escrow accounts. The amounts in these accounts were to be distributed to First Federal, if it purchased the income producing assets, and otherwise to Murry. The accounts *21 were assigned to First Federal on July 9, 1971, when it formally purchased the assets. After May 11, 1971, at a time not disclosed by the record, Murry entered into an option agreement with KAM, which provided in part as follows: 1.Murry hereby gives and grants unto the Corporation a 75 day option to acquire all or any part of his property described in Schedules A, B and C attached hereto [his income-producing assets involved herein], as contribution to capital. 2. This option is contingent upon the Corporation entering into an agreement with FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF LAKE WORTH, by which: A. All of the Corporation's debts will be paid, or FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF LAKE WORTH will indemnify and hold it harmless from and against all claims of its creditors; all recorded liens for labor and materials furnished in the construction of MURRY HILLS GARDEN APARTMENTS will be released from the land of said development; the 2 uncompleted condominium apartment buildings of said development will be completed; the conveyance of good and marketable title to all apartments of said development will be possible; and FIRST FEDERAL SAVINGS *22 AND LOAN ASSOCIATION OF LAKE WORTH will indemnify and hold it harmless from and against all claims of those purchasers of apartments at MURRY HILLS GARDEN APARTMENTS who have not received deeds to apartments, provided such claims arise as a result of making a Purchase Agreement with the Corporation. B. All or part of the property described in Schedules A, B and C is required to accomplish said objectives. Although the option to purchase was phrased in the language set forth above, KAM's option to acquire the property in question was intended to be and was in substance contingent upon KAM's entering into an agreement with First Federal to sell to First Federal the assets thus to be acquired from Murry upon exercise of the option. Notwithstanding that the "Option Agreement" states it was "made and entered into this 23rd day of April, 1971", it was in fact, as indicated above, entered into sometime after May 11, 1971, and backdated to April 23, 1971. On June 25, 1971, KAM entered into an agreement with First Federal whereby KAM agreed to sell to First Federal all assets received pursuant to its proposed exercise of the option under the foregoing Option Agreement. The agreement *23 contemplated that KAM would acquire all of the income-producing assets pursuant to the option.On that same day the individual petitioners applied to First Federal for a loan of $112,400, [9] which the bank simultaneously approved. Sometime after July 1, 1971, KAM exercised its option to acquire the income-producing assets. Thereafter, on July 9, 1971, First Federal formally purchased the assets from KAM and made the $112,400 loan to the individual petitioners. None of the petitioners ever reported gain on the sale of the income-producing assets. The individual petitioners' position was that the transfer of the assets to KAM was tax free and that KAM should have been chargeable with the gain on the sale. KAM, however, never filed a tax return for the relevant tax year. In the deficiency notices herein, the Commissioner determined that both the individual petitioners and KAM were liable for the tax with respect to the gain on the sale of the income-producing assets. He now concedes that only either the individual petitioners or KAM is so liable. Although he has *24 taken inconsistent positions to protect the Government's interests, he urges us to hold that the individual petitioners, rather than the corporation, shoudl be held accountable for the gain on sale. The parties agree that the gain on the sale was $1,189,756.30, regardless of which petitioner is liable. OPINION Murry was personally the owner of certain valuable income-producing assets. In an effort to avert the economic failure of Murry Hills, a condominium apartment development, he negotiated an arrangement with First Federal, the project's principal creditor, whereby it would purchase those assets for an amount which (in conjunction with concessions to be made by other creditors and additional contributions by "owners" of individual condominium units) would be used to rescue the project. [10] During most if not all of the relevant proceedings Murry owned the assets to be sold, but, before a formal sales agreement was executed, he transferred them to KAM, the developer of Murry Hills. KAM then transferred the assets to First Federal. The gain on sale was admittedly $1,189,756.30.The essential question before us is whether Murry is chargeable with that *25 gain. [11]
*26 It is a fundamental principal in determining for tax purposes which of different taxpayers sells property, that "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title". Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945). See also Hallowell v. Commissioner,56 T.C. 600, 606 (1971). Whether a taxpayer actually sells property or acts merely as a "conduit" for another "is for the trial court, upon consideration of an entire transaction, to determine". United States v. Cumberland Pub. Serv. Co.,338 U.S. 451, 456 (1950). In this case, we find as a fact that KAM acted merely as a conduit for passing title to the income-producing assets to First Federal. The record before us parallels the situation considered by the Supreme Court in Court Holding Co. Murry, upon discovering the Murry Hills problem, contemplated selling his interests in certain assets so as to raise necessary cash. As the problem was better defined and the parties *27 recognized its severity, Murry again offered to sell or take a loan against his income-producing assets. Thereafter, as he negotiated a solution to the problem, it is clear that the plan was for him to sell his assets directly to First Federal. Only later, in an attempt to avoid possible "tax problems" did he consider a "contribution" of the assets to KAM followed by "KAM's sale" of the assets to First Federal. However, by then it was clear that Murry was the seller and KAM merely his conduit. On April 16, 1971, First Federal made a written offer to Murry to purchase his interests in the relevant assets. There was no explicit mention nor any implicit suggestion that any person other than Murry, individually, would be the seller of the assets. On April 20, 1971, Murry's attorney, in "an effort to compromise", stated in a letter that "Murry [would] * * * be willing to sell the assets named" in First Federal's offer. Again no mention was made of the seller being other than Murry. Indeed, as shown by the evidence, the letter notes that Murry's tax liability on the sale would be between $220,000 and $250,000, a burden Murry was willing to accept *28 if First Federal would, in effect, raise its offer $100,000. First Federal considered the letter a "rejection" of its offer. Finally, after a discussion with his tax advisors, Murry accepted "First Federal's offer as oulined in * * * [the] letter of April 16, 1971", provided he could transfer the assets through KAM. First Federal was unconcerned by this merely formal variation in consummating the transaction, and it was regarded merely as involving "more documents to check". To be sure, a transferee's sale of assets immediately after he receives them in a transfer, even where the transferor had recently concluded negotiations with respect to such sale with the same buyer, does not always require a result like that reached in Court Holding. In Cumberland Pub. Serv. Co.,supra, the Supreme Court intimated that a sale through a related transferee would not be ignored as a sham if the finder of fact determined that the original seller had abandoned sales negotiations. 338 U.S. at 454-455. Here, the record is clear, and we find as a fact, that Murry never abandoned the plan whereby he would sell his assets directly to First Federal. *29 The actual form of the assets' sale supports the conduit theory. KAM never received nor could it receive any of the assets unless it first agreed to sell them to First Federal. Moreover, even while it held the assets for a brief period it received no income and was not entitled to receive any income from the assets, as such income was being placed in trust for the benefit of either First Federal or Murry. KAM neither controlled the assets nor enjoyed the benefits or bore the burdens thereof. KAM was obviously nothing more than a mere conduit. In addition, the record is devoid of any evidence of KAM's participation in sales negotiations. After surveying the case law applicable where, as here, the Commissioner had characterized a selling entity as a mere conduit, the Fifth Circuit [12] held ( Hines v. United States,477 F. 2d 1063, 1069-1070 (5th Cir. 1973)): that the since qua non of the imputed income rule is a finding that the corporation actively participated in the transaction that produced the income to be imputed. Only if the corporation in *30 fact participated in the sale transaction, by negotiation, prior agreement, postdistribution activities, or participated in any other significant manner, could the corporation be charged with earning the income sought to be taxed. See also Baumer v. United States,580 F. 2d 863, 870 (5th Cir. 1978); Bolker v. Commissioner,81 T.C. 782, 800 (1983). It seems clear that KAM participated only marginally, not "significantly", and then only in a formal way in the sale of the income-producing assets.Its "participation" occurred only after Murry had agreed to sell the assets to First Federal, and then only in circumstances where KAM was able to obtain the assets from Murry on a contingency that effectively required it in turn to "sell" the assets to First Federal. *31 Petitioners urge that we should respect the form in which they cast the sale of the assets because it was motivated by non-tax considerations. There is no merit to the point. We are not persuaded by the evidence that there were any such non-tax considerations that entered into the decision to use KAM as an intermediary. The record fails to disclose that there was any business purpose in routing the sale through KAM. To be sure, Murry had an ample business purpose for selling his assets to First Federal, since his license as a contractor was in jeopardy and his future livelihood was at stake. See n. 10, supra.But there is no satisfying evidence that there was any business purpose in utilizing KAM as a conduit. It is well established that although there may be a business purpose for a transaction as a whole, such business purpose may not be used to impart validity to the manner in which the transaction is carried out. Golsen v Commissioner.54 T.C. 742, 755 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Cf. Kuper v. Commissioner,533 F. 2d 152, 155-159 (5th Cir. 1976), *32 affg. on this issue 61 T.C. 624 (1974). It must be remembered that Murry was personally liable on KAM's mortgage notes, and that his assets could in any event have been reached by First Federal if it had insisted on enforcing its rights. Petitioners' brief indulges in nothing more than pure speculation, unsupported by convincing evidence, in arguing that it was unlikely that First Federal would have pursued its rights against those assets. In truth and in fact, there was no business reason whatever for utilizing KAM as a conduit in a sale of Murry's assets in which a gain of $1,189,756.30 was realized. He cannot escape tax on that income by use of such a transparent device as the one that we have before us. Petitioners' brief indulges in many involved theoretical discussions and makes various arguments, all of which we have carefully considered. However, the conclusion that we have reached in our findings and opinion override all of those contentions. Cf. Hallowell v. Commissioner,supra,56 T.C. at 609. It would serve no useful purpose to engage in a discussion thereof, for, to do so, would misleadingly suggest that they have *33 some validity in the context of this case. This is a strong case against petitioners' position. Enough said. We uphold the Commissioner's determination in docket No. 107-76 that the individual petitioners must include gain with respect to the sale of the income-producing assets in their 1971 taxable income. [13] Concomitantly, we reject his determination on this issue in docket No. 110-76. *34 To reflect concessions, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Lakeside Garden Developers, Inc., docket No. 108-76; Kenneth A. Murry, docket No. 109-76; and KAM Construction, Inc., docket No. 110-76.↩
2. Prior to November 16, 1971, KAM Construction, Inc., was known as Ken Murry & Sons Developers & Builders, Inc.↩
3. At trial, Murry testified that he and his wife↩ initially owned a one-half interest in the Murry Hills recreation facilities and related lease. However, numerous documents in evidence describing the facilities and the lease identify Murry alone as the owner of the one-half interest. Whether Murry alone or whether he and his wife together owned that one-half interest appears to be of no consequence to the issue herein, and, for convenience, Murry alone will be treated as the owner in this opinion.
4. A description of the Lakeside Point Gardens project appears in Lakeside Gardens Developers, Inc. v. Commissioner,T.C. Memo. 1976-290, 35 TCM 1294, 45 P-H Memo T.C. par. 290 (1976), affd. sub nom, Murry v. Commissioner,601 F. 2d 892↩ (5th Cir. 1979).
5. The terms "subcontractors" and "labor" are each used loosely in the findings and opinion herein to include both subcontractors in the usual sense and labor directly employed by Murry.↩
6. Other documents and letters in evidence indicate various "costs" of solving the Murry Hills problem ranging upwards from about $1,500,000. ↩
7. The amount needed to repay the "outstanding loans related to the Lakeside leases" was not directly a "cost" of the Murry Hills problem. However, First Federal included it in its estimate, probably because in valuing the assets available to remedy the problem it considered the value of the leases notwithstanding these loans. If the amount of the loan is not so included, First Federal's computation approximates Murry's.↩
8. The letter states that "neither [its] * * * contents * * * nor the statements made herein can be used in any court proceeding for or against Mr. Murry". However, the letter is contained in one of the stipulations of the parties, and petitioners have never objected to its use in this case.↩
9. It is unclear why the loan was for $112,400 and not the earlier agreed amount of $100,000.↩
10. It was a matter of considerable importance to Murry that the project be saved, and that clear deeds of title be given to the purchasers of the condominium units. Some 178 purchasers who had paid for their units had already taken possession, but KAM was unable to give them dees of clear title in view of the prior rights of First Federal under the construction loans and the prior rights of other lienholders of record. The situation had reached crisis proportions, and the evidence shows that there were even grand jury proceedings in which Murry was obviously a target, although no indictment was returned against him. Plainly, his license as a contractor and his future livelihood as a contractor were at stake. First Federal, too, was interested in saving the project, because its reputation in the community could have suffered if it had insisted on its prior rights and foreclosed on its mortgage notes, thereby depriving purchasers of their apartment units which they had paid for and which they had perhaps reasonably but mistakenly believed to be their own property. ↩
11. Petitioners' objective in seeking to attribute that gain to KAM rather than to Murry is obviously based on the fact that KAM had losses that were plainly expected to absorb the gain.↩
12. The parties stipulated that appeal for all petitioners is to the Eleventh Circuit, which has recently been carved out of the Fifth Circuit. The Eleventh Circuit has stated that it will follow the precedents of the Fith Circuit that were in existence prior to the creation of the Eleventh Circuit. Bonner v. City of Prichard,661 F. 2d 1206, 1207↩ (11th Cir. 1981).
13. At the trial, petitioners sought permission to amend their pleadings to raise an entirely new issue, namely, that they were entitled to a "loss" deduction in respect of the transaction involved. However, they presented no proposed amendment, and it was clear to us that such new issue would have called for investigation of further facts and presentation of additional evidence, not necessarily required for the consideration of the issue then before the Court, namely, who (as between Murry and his corporation) was chargeable with the gain realized on the sale of the assets. In our judgment, it would have been unfair to respondent to inject any such new issue into the case at that late date, and, in the exercise of our discretion, we denied petitioners' request. Moreover, at the conclusion of the trial, when petitioners, in a final effort to raise that new issue again, moved to amend the pleadings to "conform" to the evidence, we again exercised our discretion to deny the motion.On the basis of the record then already made, we had serious doubts as to the validity of the point in any event is respect of the tax year in litigation before us, and this was an additional element reinforcing our exercise of discretion at that time.↩